Under an indictment charging murder in the first degree appellant was convicted of manslaughter in the first degree and the jury fixed his punishment at ten years imprisonment in the penitentiary. At arraignment, in the presence of his retained counsel, appellant pleaded not guilty. After *Page 890 
sentence was imposed appellant gave notice of appeal and his sentence was suspended pending appeal. He is presently at large under a fifteen thousand dollar bond. Trial counsel represents him on this appeal.
On the night of October 12, 1977, there was a shootout between appellant and the deceased near a place known as Frank Clara's Burger Basket on Highway 168 in Boaz, Alabama. After the shooting the deceased was found dead in the back seat of his 1969 Buick automobile and appellant drove his car to his mother's home where he was carried to the Boaz-Albertville Hospital. The rescue squad removed the victim from the Buick and transported him to the same hospital but he was pronounced dead on arrival.
The testimony during the three day trial was in hopeless conflict and only a jury could unscramble this conflicting evidence and arrive at a verdict.
The central place of this drama was the Sundown Apartment complex in Boaz, where appellant and his wife had an apartment. The deceased and his brother occupied an apartment in this same complex. Appellant's mother was manager of the Sundown Apartments and his father was the maintenance man. Appellant's sister and her two children also had an apartment in the same place. Prior to his death the deceased and his brother had lived at the Sundown Apartments for two to three months.
Appellant's marriage to Charlotte was apparently an unhappy one. After the deceased moved in this apartment complex he and Charlotte began seeing each other. On Friday, September 2, 1977, Charlotte did not come home. Appellant could not locate her and reported to the local police that she was missing.
The following Monday, Labor Day, appellant approached Jerry Irvin and asked him where Charlotte was. Irvin replied that he did not know. The evidence was in conflict as to what took place next. The State's witness, Stanley Irvin, testified that appellant walked up to Jerry and hit him, and that he (Stanley) pulled appellant away from his brother. Appellant then, according to Stanley, threatened to kill Jerry Irvin. The testimony of appellant and other defense witnesses who were present indicated that Stanley Irvin held appellant while Jerry Irvin hit him and that, when the fight was broken up, Jerry told appellant, "there would be another time".
On September 7, 1977, Charlotte returned for her things and moved out. The evidence was uncontroverted that during the period between Labor Day and the day Jerry Irvin was killed Charlotte Grey was seen on several occasions going into Irvin's apartment with him. On some of these occasions Irvin was carrying a shotgun, and Charlotte's car was seen parked overnight at the apartment. She also had a key to the apartment. Appellant testified that he once saw Jerry Irvin standing at his window pointing a rifle at appellant's apartment, which was across from Irvin's apartment. This testimony was substantiated by two other witnesses.
The testimony of both appellant and the State's eyewitness, M.R. Fine, Jr., revealed that, on the day of the shooting, appellant went to Fine's apartment around 6:00 p.m. The two men had a couple of drinks and talked about appellant and Charlotte "getting back together". The couple had been seeing each other for several days, talking about a reconciliation. Appellant told Fine that he was still in love with his wife, and that he was worried because he was supposed to see Charlotte that night and had not heard from her. The two men were going to appellant's apartment when he stated that he was concerned about where Charlotte was. Fine told him that he had seen her car parked earlier in front of her father's business. Appellant and Fine got in appellant's car and went to see if the car was still there. When they arrived, Charlotte's car was parked next to the deceased's car and she and Irvin were sitting in the front seat of his automobile.
Mr. Fine testified that appellant got out of the car and went toward the car occupied by Charlotte Grey and Jerry Irvin. Charlotte got out and screamed "stop him, stop *Page 891 
him." Appellant went to the driver's door and Fine testified that he then saw a pistol in his hand, pointed at Irvin. Fine testified that he ran to appellant, grabbed his arm and got the gun above the car. As appellant snatched away from him, Fine heard a shot and ran across the highway. He heard more shots and, as he turned around appellant went to his car and left. Fine went back to Irvin's car and found him in the back seat.
Appellant's testimony of the events on the day of the shooting was essentially identical to that of Fine up to the time of the actual shooting. Appellant testified that, when he reached the door of the car in which Irvin was seated, it swung open and he saw deceased with a pistol in his hand. Appellant kicked the door closed and pulled his gun. At this point, Fine grabbed his arm and, while appellant was trying to pull away, Jerry Irvin shot him three times. Appellant testified that Irvin was "fixing to shoot me again, and I just unloaded my gun." Appellant stated that Irvin was trying to get over the seat of the car, that he knew Irvin kept a shotgun in the back seat, and he thought he was trying to get the shotgun.
The State toxicologist testified that he performed a post-mortem examination on the body of Jerry Irvin which revealed the presence of five gunshot wounds, one of which instantly caused death, entering the brain at the left temple. A blackjack was found in the deceased's boot at the hospital.
The doctor who performed surgery on appellant for injuries sustained by him in the shooting indicated three gunshot wounds, one of which caused massive bleeding in the abdominal cavity and injury to the liver. Appellant was also hit in the chest, approximately one inch from the heart.
There was testimony that appellant normally carried a gun in a holster. Appellant's father testified that he observed a sawed-off shotgun, a double barrelled shotgun and a blackjack in Jerry Irvin's apartment shortly before his death, and that appellant was aware of the presence of the weapons. Irvin's father testified that after the shooting he removed a rifle and a shotgun from his son's apartment.
Charlotte Grey, appellant's wife, took the stand and asserted her privilege not to testify against her husband.
The circumstances surrounding the death of Jerry Irvin are those of the classic lovers' triangle. Irvin openly saw appellant's wife while she was separated from him. Appellant knew of this, and there was at least one confrontation between the two men over Charlotte Grey during this period. Both men were known to carry firearms. For several days immediately prior to the shooting, appellant and his wife had apparently been negotiating a reconciliation. They were to see each other on the night appellant found her with Jerry Irvin, and he was already upset over her absence.
Notwithstanding that passionate and unreasoned responses are often involved in situations such as this, the law does not condone the unjustified taking of a human life. Although the evidence indicated that Jerry Irvin may have shot first, a conclusion by the jury that appellant was not free from fault in bringing on the difficulty was reasonable. That the jury took into account the nature of the crime passionel is evidenced by the verdict of manslaughter.
The rule of law governing reduction of homicide from murder to manslaughter as a result of the heat of passion was announced inHooks v. State, 99 Ala. 166, 13 So. 767:
 "The principle we announce is that the law does not declare the provocation sufficient unless the parties are detected in the act; but a jury may say whether the compromising position of the parties was sufficient to arouse passion in the husband to such a degree as to overthrow reason, just as a jury may say, in other cases, whether the offense was the result of sudden and sufficient provocation to reduce the offense from murder to manslaughter. . . . There is no law, unless made so by statute, which wholly excuses the husband from liability for *Page 892 
taking the life of the wife or her paramour, although he slay them, or either, while in the act of adultery."
For a court to reduce the degree of homicide, as a matter of law, to manslaughter, the offending parties must be caught in the very act of adultery. Where, as here, the parties are found in a compromising situation, it is for the jury to determine the sufficiency of the provocation. Hooks, supra; Rigell v. State,8 Ala. App. 46, 62 So. 977; Warren v. State, 34 Ala. App. 447,41 So.2d 201.
The trial court fully charged the jury on the degrees of homicide applicable under the facts of this case, reduction from murder to manslaughter by sudden heat of passion, and self-defense. The verdict of the jury was well within the boundaries of the evidence presented and the charge of the court.
Appellant raises on appeal a serious and troubling issue, striking at the heart of our adversary system of justice. He correctly contends that, throughout the trial of this case, the district attorney repeatedly attempted to elicit incompetent and illegal evidence in examining both State and defense witnesses and made comments directed toward the integrity of defense counsel and even his own witnesses. Counsel for appellant diligently objected on these occasions, which objections were sustained by the trial court. Further, appropriate instructions were emphatically and unequivocally given to the jury to disregard, and the jury queried on one occasion whether they had been prejudiced. The jury responded in the negative.
Typical of the instructions of the trial court to the jury after sustaining objections of defense counsel to illegal questions of the district attorney is the following example:
 "Sustain your objection to the remarks of the District Attorney. Ladies and gentlemen, do not pay any attention whatsoever to that remark of the District Attorney but completely, absolutely, totally ignore it; do not consider it whatsoever in reaching your decision in this case."
The conduct of the prosecutor in this case was highly improper and is condemned by this Court. Were it not for the prompt and careful actions of the trial court, reversal would be compelled. Where the trial court acts promptly to impress upon the jury that improper statements and questions are not to be considered by them in their deliberations, the prejudicial effects of such remarks are removed. Woods v. State, Ala.Cr.App., 344 So.2d 1225, cert. quashed, Ala., 344 So.2d 1230, and cases cited therein. Further, the refusal of the trial court to allow witnesses to answer improper questions rendered those questions harmless.Woods, supra; Strickland v. State, 269 Ala. 573, 114 So.2d 407;Packer v. State, 55 Ala. App. 30, 312 So.2d 601.
Due to the attentiveness and promptness of the trial court toward the preservation of appellant's right to a fair and impartial trial, the deplorable conduct of the district attorney cannot be said to mandate a reversal.
A careful search of the record reveals no error injuriously affecting the substantial rights of appellant. The judgment of conviction is, in all things, affirmed.
AFFIRMED.
All the Judges concur.